IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CFA NORTHERN CALIFORNIA, INC., | No. C 04-5049 CW |
| Plaintiff, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| CRT PARTNERS, LLP; CLAIRE THOMAS; and ROBERT CAMPBELL, | |
| Defendants. | |

Plaintiff CFA Northern California, Inc. (CFANC) moves for partial summary judgment on its first claim for breach of contract. Defendants CRT Partners, LLP (CRT) and Claire Thomas oppose the motion and cross-move for summary judgment. Plaintiff opposes their cross-motion. The matters were heard on April 21, 2006. Having considered the parties' papers, the evidence cited therein and oral arguments, the Court denies Plaintiff's motion and grants Defendants' motion.

BACKGROUND

Defendant CRT entered into the written contract at issue with an entity identified in the contract as Corporate Finance Associates (CFA). Paul Jeffrey Johnson signed for CFA, identifying

himself as its Senior Partner.  However, Plaintiff CFANC[1] brings this lawsuit for breach of the contract between CFA and CRT. Plaintiff CFANC is a California corporation having its principal place of business in California.  Mr. Johnson is the President of Plaintiff CFANC.  He states that CFA is a fictitious business name consistently used by Plaintiff CFANC, and is registered as such with the Clerk of Contra Costa County.  But, as explained below, CFA is also the name of an entirely different, international business entity.

Plaintiff CFANC is an intermediary that introduces potential purchasers of companies and businesses to potential sellers.  It was founded in 1997 and, at the time in question, it had one office, no assets and no insurance; its sole stockholders were Mr. Johnson and his wife.  Defendant CRT is an Arizona limited liability partnership having its principal place of business in Arizona.  It owns and operates eighteen Jack-in-the-Box restaurant franchises in Arizona.

In 2002, Mr. Johnson contacted Defendant Thomas on behalf of a client who was interested in purchasing Defendant CRT's Jack-in-the-Box franchises.  Defendant Thomas, one of the partners in Defendant CRT, was interested in selling because she wanted to retire.  After a few months of talks and trading information, the deal fell through; Mr. Johnson's client did not purchase the

---

[1] In the original complaint, first amended complaint and second amended complaint, CFA Northern California, Inc. is identified as the plaintiff.  At Mr. Johnson's deposition, he stated that there is no such entity as CFA Northern California, Inc. and that Plaintiff should be identified as CFAW Northern California, Inc.

2

franchises. Mr. Johnson and Defendant Thomas then began discussing whether Mr. Johnson could find another purchaser for the Jack-in-the-Box franchises.

In April, 2003, Defendant Thomas came to California and met with Mr. Johnson. They further discussed Mr. Johnson representing Defendant CRT to find a buyer for the Jack-in-the-Box franchises. During this meeting, Mr. Johnson provided Defendant Thomas with written materials regarding an international entity identified as CFA. The front page of a CFA marketing document stated that it was prepared for Defendant CRT and Defendant Thomas, and included a seal highlighting "45 years of excellence." The document listed "CFA Benefits," which included sixty-five seasoned professionals; thirty-five offices (plus nine in Europe); and the fact that it was founded in 1956. Page 12 emphasized CFA's "Proven Track Record" and featured a photo of a conference table covered with closing documents. Mr. Johnson's biography, provided with the marketing document, stated that he "is a Senior Partner of Corporate Finance Associates responsible for Northern California." Also provided with the materials was an article entitled, "Five Biggest Mistakes Sellers Make When Choosing A Buyer." The article described CFA as

> an international organization with offices in cities across the United States and Canada and affiliates in 10 countries overseas. . . . The professionals who represent CFA work with privately held companies in mergers, acquisitions, divestitures and corporate finance. Typically our clients have sales in the 3-100 million dollar range . . . . With a 45-year history in the field, CFA has more offices with more combined experience than any other organization of intermediaries in the U.S. Our Associates have completed several thousand transactions for middle market business owners since 1956.

3

During their discussions, Defendant Thomas explained to Mr. Johnson that she had originally wanted to sell her interest in the business to Laura Olguin, but that she could not obtain approval from the Jack-in-the-Box corporation to do so.  At that time, the Jack-in-the-Box corporation required new franchise owners to be individuals, not corporations, living within a one-hour drive of the restaurant, who were not engaged in any business activity other than operating a Jack-in-the-Box restaurant.  A new franchise owner also had to have substantial capital resources.  Ms. Olguin did not have the required capital resources.

After Defendant Thomas met with Mr. Johnson, the parties began negotiating an agreement.  The Sidney Kohn Law Firm represented Defendants in the negotiations and the parties exchanged correspondence regarding modifications to the agreement.  One modification was to add "not including real estate" after the phrase describing the restaurant franchises for sale, to clarify that only the restaurant franchises were for sale, not the underlying property.  Another modification was to add the language quoted below defining "Interested Parties"; this modification limited Defendant CRT's obligation to pay a success fee after the agreement between the parties was terminated.

On May 19, 2003, an entity identified as CFA and Defendant CRT entered into the contract at issue, entitled Seller's Authorization and Exclusive Fee Agreement, for the sale of "EIGHTEEN JACK IN THE BOX RESTAURANTS (not including real estate) LOCATED IN TUCSON, AZ."  Mr. Johnson, identifying himself as a senior partner, signed on behalf of CFA, called the Consultant.  Defendant Thomas and her

4

1  partner Robert Campbell signed on behalf of Defendant CRT, called
2  the Client.  The Agreement provides, in part, that:

> The party signing below as (Client) engages the undersigned (Consultant) to assist Client and/or its shareholders, principals, subsidiaries and partnerships (Affiliates) to accomplish a sale, merger, exchange, capital investment, loan, joint venture or other such transaction (Transaction) involving all or part of the business interest of Client, including, but not limited to, stock and assets owned directly or indirectly by Client or Affiliates described general [sic] as follows: EIGHTEEN JACK IN THE BOX RESTAURANTS (not including real estate) LOCATED IN TUCSON, AZ AND LISTED ON PAGE 4. Client engages Consultant on a exclusive basis and agrees to forward to Consultant all inquiries from any party during the term of this Agreement.  Client's obligations to Consultant shall arise regardless of any specific involvement of Consultant. . . . The Agreement shall remain in effect for twelve (12) months from this date unless terminated by either party upon 30 days prior written notice. . . . Client's fee obligation to Consultant shall survive this Agreement for Transactions with Interested Parties that close within one (1) year after the termination of this Agreement.  Interested Parties shall mean those parties that during the term of this Agreement have gone through all of the following process and protocol to be conducted by the Consultant: (1) Party responding to the knowledge that the business opportunity was for sale, (2) Consultant, thereafter, obtains a signed Confidentiality Agreement from the party, (3) Consultant reviews the party's Dunn & Bradstreet ("D&B") profile, (4) Consultant speaks to the party and inquires as to the party's wherewithal and motivation to acquire the business, (5) Consultant speaks to the Client's representative, Claire Thomas, and informs her of the response of the party, Consultant's knowledge of the party and the Consultant's recommendation whether to send the offering document (Descriptive Report prepared by Consultant) to the party; and (6) Claire Thomas authorizes the Consultant to send the Descriptive Report to the party.

The Agreement uses the CFA logo, the same logo used on the written materials Defendants received regarding the international CFA entity.

Mr. Johnson states that, on occasion, Plaintiff CFANC will agree in writing to accept a reduced success fee for already-

5

1  identified suitors, but that Defendants did not request any such
2  provision, or make any reservation, condition or restriction,
3  addressing the possibility that Ms. Olguin would become qualified
4  to become a franchise owner.
5       After the Agreement was signed, Plaintiff CFANC prepared a
6  twenty-nine page descriptive report, explaining that a chain of
7  eighteen Jack-in-the-Box restaurant franchises was being offered
8  for sale.  The report clarified that only the restaurant operations
9  were for sale and that, because the owner/franchisee was a
10 partnership, an asset sale was anticipated.  The report further
11 explained that "CRT owns the real estate of 14 of the 18
12 restaurants.  The leases for the four leased units will be assigned
13 to the new owner.  CRT will lease the remaining 14 at graduated and
14 reasonable lease rates (further discussed in the Facilities
15 section), to assist the new owner in getting started for the first
16 few years."
17      Plaintiff CFANC states that it marketed the franchises to
18 almost 800 pre-qualified potential buyers, and introduced
19 Defendants to numerous potential acquirers of the franchises.
20 According to Defendants, however, after preparing the descriptive
21 report and a market valuation, Plaintiff CFANC did nothing that was
22 designed to locate an individual who would qualify as a buyer.
23 Instead, it solicited unqualified buyers, such as private equity
24 groups, existing restaurant operators and out-of-state individuals.
25 Defendant Thomas states that she explained to Mr. Johnson that the
26 Jack-in-the-Box corporation would not approve of the buyers
27 Plaintiff CFANC was soliciting.
28

6

According to Plaintiff CFANC, in November, 2003, Defendant Thomas advised it that Ms. Olguin now qualified as a owner/operator, that it should not deal with Ms. Olguin and that it would not be paid its success fee. Defendant Thomas, however, testified that by November, 2003, she concluded that Plaintiff CFANC would not be successful in selling the franchises and orally terminated the contract. Soon thereafter, the Jack-in-the-Box corporation relaxed the restrictions for an owner/operator, which would allow Ms. Olguin, who had a ten percent interest in Defendant CRT, to increase her interest. Defendant Thomas testified that Mr. Johnson continued to send correspondence indicating that he was still doing work on Defendant CRT's behalf, even after she terminated Plaintiff CFANC's services.

On December 31, 2003, Plaintiff CFANC sent Defendants a current market report identifying Defendant CRT itself as a potential buyer. Defendant Thomas states that, because Plaintiff CFANC continued to contact her regarding its representation, even after she verbally terminated the contract, she asked Defendant CRT's lawyer to send a written notice of termination. On January 13, 2004, Defendant CRT, through its lawyer, gave written notice of the termination of the Agreement.

In May, 2004, Defendant CRT acquired Defendant Thomas' interest in Defendant CRT for $3,160,000. The transaction closed in August, 2004, less than twelve months after Defendant CRT terminated the Agreement.

Plaintiff CFANC claims that, under the Agreement, Defendants owe it a $246,400 success fee. Defendants disagree.

7

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate

9

1  burden of persuasion at trial.  Id. at 1107.

2  Where the moving party bears the burden of proof on an issue
3  at trial, it must, in order to discharge its burden of showing that
4  no genuine issue of material fact remains, make a prima facie
5  showing in support of its position on that issue.  UA Local 343 v.
6  Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That
7  is, the moving party must present evidence that, if uncontroverted
8  at trial, would entitle it to prevail on that issue.  Id.; see also
9  Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th
10 Cir. 1991).  Once it has done so, the non-moving party must set
11 forth specific facts controverting the moving party's prima facie
12 case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's
13 "burden of contradicting [the moving party's] evidence is not
14 negligible."  Id.  This standard does not change merely because
15 resolution of the relevant issue is "highly fact specific."  Id.

DISCUSSION

I.  Defendants' Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment based on their affirmative defense that the Agreement is voidable. They entered into the Agreement based on their misunderstanding, fostered by Mr. Johnson, that they were contracting with an entity called CFA, which was an established, experienced international company, not with Plaintiff CFANC, a one-man corporate entity that had completed only six sales of businesses located in California, and had no insurance and no assets.  They would not have entered into the Agreement if Mr. Johnson had not misled them to believe that they were contracting with the international CFA entity.

10

Defendants contend that they cannot be held liable in contract to an entity with which they never intended to contract.

Arizona law provides that a transaction induced by the material misrepresentation of a party is voidable against that party. Lehnhardt v. City of Phoenix, 105 Ariz. 142, 144 (1969) ("It appears to be well-established law that a claim for rescission, as opposed to a claim for damages, may be granted when 'innocent' as well as fraudulent misrepresentations are made, and that accordingly, proof of each of the nine elements of actionable fraud is not essential in a rescission action."). A claim for rescission is established by showing: a representation made by the contracting party; the representation's falsity; its materiality; and the fact that it was an inducing cause for the party entering into the contract. Hubbs v. Costello, 22 Ariz. App. 498, 501 (Ariz. App. 1974). Quoting the Restatement of Contracts § 470(2), Arizona courts have found that a "misrepresentation is material where it 'would be likely to affect the conduct of a reasonable man with reference to . . . .' the transaction in question." See, e.g., id. A "misrepresentation" is the "concealment of what is true as well as the assertion of what is false." State v. Carrasco, 201 Ariz. 220, 224 (Ariz. App. 2001) (quoting State v. Coddington, 135 Ariz. 480, 481 (Ariz. App. 1983)).

Furthermore, before a binding contract is formed, the parties must mutually consent to all material terms. Hill-Shafer P'ship v. Chilson Family Trust, 165 Ariz. 469, 473 (1990). The Arizona Supreme Court has explained:

11

> If one party thinks he is buying one thing and the other party thinks he is selling another thing, no meeting of the minds occurs, and no contract is formed. The most famous statement of this point of law arose in the case of <u>Raffles v. Wichelhaus</u>, 2 Hurl. 906, 159 Eng.Rep. 375 (1864). In <u>Raffles</u>, the parties agreed on a sale of goods which was to be delivered from Bombay by the ship "Peerless." In fact, two ships named "Peerless" were sailing from Bombay at different times, and each party had a different ship in mind. The arrival time of the merchandise was of the essence to the contract. Because the understandings of the parties were different as to a material term, no binding contract was formed.

<u>Id</u>. at 473-74 (citations omitted).

As noted above, Mr. Johnson gave Defendant Thomas written materials describing CFA as an international organization with offices throughout the world and a proven track record, spanning almost half a century, in completing business sales, mergers and acquisitions. Mr. Johnson now claims that Plaintiff CFANC was the contracting party but he never told Defendants that the international CFA entity was not the contracting party. The Agreement describes only CFA; Mr. Johnson signed the Agreement as CFA's "senior partner," which is how he was described in the written materials describing CFA. Plaintiff CFANC, however, is a different entity; Mr. Johnson stated at his deposition that he is the president of CFANC, not its senior partner. Nor did Mr. Johnson inform Defendants that CFA is a fictitious name, under which Plaintiff CFANC is licensed to do business, or that there is more than one organization using the name CFA.

Mr. Johnson claimed at his deposition that he explained to Defendant Thomas that "CFA" was a network of independently owned and operated offices. But when asked if he did anything at any time to explain to Defendant Thomas that she would not be entering

12

into a contract with the international CFA entity described in the written materials, Mr. Johnson responded, "No." When asked if it would be reasonable for Defendant Thomas to assume that the CFA he was associated with is the same CFA that has offices across North America and Western Europe, Mr. Johnson responded, "Yes." When asked how anyone looking at the Agreement would know whether they had contracted with Plaintiff CFANC or the international CFA entity, Mr. Johnson responded, "They wouldn't." He conceded that no document or notice was provided to Defendants disclosing that he was acting as the president of Plaintiff CFANC, and not as a senior partner of the international CFA entity.

According to Defendants, it was not until Mr. Johnson's deposition on January 23, 2006, that they discovered that they had not entered into an Agreement with the company described, in the written materials they were given, as having "completed several thousand transactions for middle market business owners since 1956." Instead of contracting with a company with "45 years of excellence," they learned that they had entered into a contract with a young company that had completed only six sales, of businesses located in California, not several thousand transactions. On the second day of Mr. Johnson's deposition, Defendants learned that Plaintiff had no insurance and no assets. Defendants state that they never would have entered into the Agreement with a one-man corporate entity with few resources and little experience in providing the services they sought.

Plaintiff responds that Defendants rely upon dicta in the

13

cases they cite.[2]  Plaintiff is incorrect.  Plaintiff's attempt to distinguish this case from Lehnardt is also unpersuasive.  The fact that there was no mention of an integration clause in the contract at issue in Lehnardt is immaterial.  Plaintiff contends that, because Defendants were represented by counsel and the integration clause in the Agreement provides that the Agreement "supercedes all prior agreements, representations, and understandings of the parties," the contract cannot be voidable based on any misrepresentation.  But Plaintiff cites no authority to support that contention.  Nor does Plaintiff dispute that Defendants intended to enter into an Agreement with an established international organization.

In sum, there is no dispute that Defendants did not intend to enter into a contract with Plaintiff CFANC.  Nor is there a dispute that Plaintiff CFANC misrepresented itself to Defendants, leading Defendants to believe that they were contracting with a company boasting of forty-five years of excellence and a proven track record of thousands of successful sales.  Thus, the contract is voidable as a matter of law and summary judgment for Defendants on this ground is granted.  The Court need not address Defendants' remaining grounds for summary judgment.

---

[2] Plaintiff also contends that, although couched in terms of misrepresentation, Defendants' argument is actually a claim of fraud in the inducement.  Because Defendants did not plead fraud in their answer, Plaintiff asserts that Defendants are barred from asserting this defense.  Defendants filed a motion for leave to amend their answer contemporaneously with their reply.  Having considered the motion and Plaintiff's opposition, the Court GRANTS Defendants' Motion for Leave to File Defendants' Amended Answer to Second Amended Complaint (Docket No. 53).

II. Plaintiff's Motion for Summary Judgment

Because Defendants' motion for summary judgment is granted, Plaintiff's motion is moot and will not be addressed.

## CONCLUSION

For the foregoing reasons, Defendants' Cross-Motion for Summary Judgment (Docket No. 48) is GRANTED. The contract is voidable as a matter of law. The Court DENIES as moot Plaintiff's Motion for Partial Summary Judgment (Docket No. 47). Judgment shall enter accordingly. Defendants shall recover their costs from Plaintiff.

IT IS SO ORDERED.

Dated: 7/6/06

_____
CLAUDIA WILKEN
United States District Judge

15